IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| IN THE MATTER OF THE JOHN E. THOMPSON AND DARLEENE P. THOMPSON LIVING TRUST DATED APRIL 22, 1993, | No. 85574-3-I |
| | DIVISION ONE |
| GERALD L. THOMPSON, Successor Trustee, and WILLARD THOMPSON, Successor Trustee, | UNPUBLISHED OPINION |
| Respondents/Cross-Appellants, | |
| v. | |
| JENNIFER P. GARCIA, Successor Trustee, | |
| Appellant/Cross-Respondent. | |

SMITH, C.J. — John E. Thompson and Darleene P. Thompson, husband and wife, executed a revocable living trust. The Thompsons' children, as well as their granddaughter, Jennifer Garcia, were the named beneficiaries. Upon Darleene's death, John changed his and Darleene's BECU accounts to put them in his name only. He named his four surviving children as the pay-on-death beneficiaries of the new accounts. Three months later, John asked his granddaughter, Jennifer Garcia, to take him to BECU so he could add her as a joint tenant on the accounts to help pay bills. When filling out the paperwork at the bank, John signed a form that had the box next to "Joint Account with Right

of Survivorship" checked with a computer-generated "X."  Upon John's death, Garcia went to BECU and removed all the funds from the accounts.

Three of John's children initiated a Trust and Estate Dispute Resolution Act[1] (TEDRA) Petition against Garcia, claiming she breached her fiduciary duty as John's attorney-in-fact and as successor trustee.  The children later amended their complaint, naming themselves in their individual capacities and bringing a claim under RCW 30A.22.100.  The trial court ruled in favor of Garcia on the initial TEDRA claims, but held the BECU accounts belonged to the Thompsons' children and imposed a constructive trust.  Garcia appeals.  We affirm the trial court in part but remand to strike the prejudgment interest.

FACTS

John E. Thompson and Darleene P. Thompson were husband and wife and had six children: Larry Thompson, John C. Thompson, Gerald A. Thompson, Willard A. Thompson, Roxie Chapin, and Donelda M. Higgins.[2]  Appellant, Jennifer Garcia, is the granddaughter of John and Darleene Thompson.

In 1993, John and Darleene created the John E. and Darleene P. Thompson Living Trust ("the Trust").  The Trust was subsequently amended twice.  The first amendment to the Trust removed Larry and John C. (who predeceased their parents) and listed Roxie, Gerald and, alternatively, Garcia as successor trustees.  It also allocated John's Tonka Truck collection to Michael

---

[1] Chapter 11.96A RCW.
[2] We refer to the parties by their first names solely for the purpose of clarity and to avoid confusion.

Friese (John and Darleene's grandson) and their SeaTac estate to Garcia. The second amendment named Willard, Gerald, and Garcia as successor cotrustees. Other than the specific allocations to Friese and Garcia, the primary beneficiaries of the Trust were the Thompsons' children. John and Darleene generally shared their intended estate plans with their family.

Darleene passed away in November 2018, and John became the sole trustee and sole current beneficiary of the Trust. The Trust included several BECU accounts that were under Darleene's Social Security number. After Darleene's death, John made several trips to BECU with his children to close the Trust accounts and open new accounts in his name only. For each new account opened, John named his four surviving children as the pay-on-death beneficiaries.

In December 2019, John asked Garcia to accompany him to BECU so he could add her as a joint tenant on his accounts. Garcia testified that she believed John was adding her to the accounts to help him pay bills. John had previously asked his daughter, Roxie, to do the same, but she declined. Roxie testified that after she declined, John told her he planned to ask one of his granddaughters, either Robyn Chapin or Garcia, to be on the account. Prior to this meeting, John did not indicate to Garcia that he intended to add her to the accounts with a right of joint survivorship.

At BECU, John and Garcia met with Nhu Nguyen. Nguyen presented John with the consumer account changes and request form, which was largely auto populated with information downloaded from the BECU database system.

3

On the form, the box next to "Joint Account with Right of Survivorship" was checked with a computer-generated "X." No evidence explains how or why that box was checked. Nguyen testified she did not remember anything about the meeting with John and Garcia. Despite having no memory of the meeting with John and Garcia, Nguyen claimed she did discuss joint right of survivorship with John because it was standard bank practice and she reviewed it "with every single member."

Garcia testified she sat with John for the majority of the meeting with Nguyen, only getting up a few times to take phone calls. Garcia did not recall many specifics of the meeting, but she testified that (1) John never mentioned a right of survivorship before the meeting; (2) she did not recall a right of survivorship being discussed at the meeting; (3) she did not recall anything Nguyen said; and (4) she would have remembered being told John had given her a right of survivorship. But Garcia did recall John reviewing the paperwork before he signed and asking Nguyen questions, though she could not recall what the questions were.

At the time John signed the form, he was 95 years old. Conflicting testimony exists regarding John's mental and physical health. Gerald, Willard, and Roxie all testified that John suffered from "cognitive issues," including mild memory loss, and Willard noted that he was never sure if John understood what he was saying. Both Gerald and Roxie testified that John had poor eyesight and he would not have been able to read the font on the BECU form. Roxie also testified that, even with his hearing aid, John could barely hear. John's

4

physician, Dr. Bateson, agreed that John suffered from poor hearing, but noted he was able to maintain conversation and appeared to understand what she discussed with him. Bateson testified that after John's hospital stay in September 2019, she was concerned about John's cognitive functioning, but her concerns were largely alleviated when she met with John again in January 2020.

John died in October 2020. A few weeks after John's death, Garcia went to BECU and spoke with a representative. At this meeting, Garcia first learned she was added to John's accounts with a right of survivorship and was now the sole owner of the accounts. At the recommendation of the representative, Garcia froze the funds in the accounts. Then, after retaining legal representation, Garcia withdrew the funds in the BECU accounts and deposited them into her own accounts. In November 2020, Gerald and Willard, in their capacities as successor trustees of the Trust, commenced a TEDRA Petition against Garcia in her capacity as successor trustee of the Trust. The Petition included counts for (1) breach of fiduciary duty; (2) undue influence; (3) constructive trust; (4) conversion; and (5) violation of the "no contest" provision of the Trust. Garcia denied any wrongdoing and claimed Willard and Gerald lacked standing as successors of the Trust because the BECU accounts were not trust assets. Garcia also argued in her trial brief that under RCW 30A.22.090, a rebuttable presumption exists that the funds are owned by her. Trial was set for June 2022, but as a result of scheduling conflicts and a backlog in the courts due to the COVID-19 pandemic, trial did not commence until May 2023.

At trial, the court granted Gerald and Willard's request to substitute themselves into this action in their individual capacities (instead of in their capacities as successors of the Trust). Gerald and Willard also added Roxie Chapin as a party[3] and amended their complaint to include a claim under RCW 30A.22.100. The Thompsons never brought a motion to substitute Garcia in her individual capacity instead of in her capacity as successor of the Trust.

After the Thompsons rested their case, the court granted Garcia's motion for involuntary dismissal under CR 41(b)(3) as to the Thompsons' counts of (1) breach of fiduciary duty; (2) undue influence; (3) no contest; (4) conversion; and (5) constructive trust. The court awarded Garcia her reasonable attorney fees and costs under RCW 11.96A.150 that she incurred in defending against the TEDRA claims. The Thompsons prevailed on their claim under RCW 30A.22.100, and the court awarded the Thompsons costs, including attorney fees. Garcia appeals.

ANALYSIS

Jurisdiction

Garcia claims the trial court erred when it entered judgment against her individually instead of dismissing the claim for lack of jurisdiction. The Thompsons contend Garcia waived the defense, as well as appellate review, by failing to raise the issue before the trial court. We disagree with the Thompsons that Garcia waived appellate review, because this court may review a claim of

---

[3] Gerald Thompson, Willard Thompson, and Roxie Chapin will hereinafter be referred to as "the Thompsons."

lack of jurisdiction for the first time on appeal (RAP 2.5(a)), but agree that Garcia waived jurisdiction by not raising the issue below. But even if she did not waive jurisdiction, the proper remedy is to grant leave to amend, not dismissal.

A court lacks jurisdiction over an individual who is not properly designated as a party. *Dep't of Soc. & Health Servs. v. Zamora*, 198 Wn. App. 44, 73, 392 P.3d 1124 (2017). Traditionally, if a party is not properly designated, any order entered against that party is void. *Zamora*, 198 Wn. App. at 73. However, " 'modern rules of procedure are intended to allow the court to reach the merits, as opposed to disposition on technical niceties.' " *In re Marriage of Morrison*, 26 Wn. App. 571, 573, 613 P.2d 557 (1980) (quoting *Fox v. Sackman*, 22 Wn. App. 707, 709, 591 P.2d 855 (1979)). If a party is "identifiable from the record or has actually been personally served, some error in the name is not fatal. The test is whether the defendant has been prejudiced by not being properly named." *Morrison*, 26 Wn. App. at 574 (citation omitted). If an improperly designated party is readily identifiable and no prejudice has occurred, the proper remedy is leave to amend, not dismissal. *Morrison*, 26 Wn. App. at 574-75.

Under CR 12(h), a party waives the defense of lack of personal jurisdiction, thereby submitting themselves to the jurisdiction of the court, by failing to raise the defense in a motion or responsive pleading. *Castellon v. Rodriguez*, 4 Wn. App. 2d 8, 15, 418 P.3d 804 (2018). In addition to statutory waiver, "Washington courts recognize common law waiver if a defendant acts in a manner inconsistent with a jurisdictional defense or is dilatory in asserting the defense." *Castellon*, 4 Wn. App. 2d at 15. This type of waiver can be

7

accomplished by seeking affirmative relief or by otherwise consenting "expressly or impliedly" to the court's jurisdiction. *In re Marriage of Steele*, 90 Wn. App. 992, 997, 957 P.3d 247 (1998).

Here, Garcia only raised the issue of personal jurisdiction in regard to the Thompsons. Garcia repeatedly asserted the Thompsons lacked standing because they were not the real party in interest, but never addressed her own designation as successor trustee of the Trust. Because Garcia failed to raise personal jurisdiction as it relates to herself, she waived the defense.

Even if Garcia had not waived the defense, the appropriate remedy would be amendment, not dismissal. Garcia was clearly identified from the record, was properly served, and participated fully in the litigation. Similar to the Thompsons, Garcia was not prejudiced by not being properly named. Therefore, the appropriate remedy is amendment, not dismissal.

Because remanding for amendment would result in the same outcome, we affirm.

<u>Joint Tenant with Right of Survivorship</u>

Garcia contends the trial court erred when it held the Thompsons had presented clear and convincing evidence to overcome the presumption regarding the right of survivorship designation with respect to the BECU accounts. The Thompsons claim the evidence was sufficient to show that John did not intend Garcia to be added to the accounts with a right of survivorship. We agree with the Thompsons. Legal title to funds in an account is a question of law and

reviewed de novo. *Taufen v. Est. of Kirpes*, 155 Wn. App. 598, 602, 230 P.3d 199 (2010).

Under RCW 30A.22.100(3), a rebuttable presumption exists that "[f]unds belonging to a deceased depositor which remain on deposit in a joint account with right of survivorship belong to the surviving depositors unless there is clear and convincing evidence of a contrary intent at the time the account was created." Clear and convincing evidence is something more than preponderance of the evidence but less than beyond a reasonable doubt. BLACK'S LAW DICTIONARY 697 (12th ed. 2024); *Bland v. Mentor*, 63 Wn.2d 150, 154, 385 P.2d 727 (1963).

While some evidence supports Garcia's position, the court found that the Thompsons presented clear and convincing evidence that John did not intend to give Garcia the right of survivorship on the accounts.

In support of its determination, the trial court found, in pertinent part, the following:

- No discussion occurred between John and Garcia or John and Nguyen regarding adding Garcia to the BECU accounts with a joint right of survivorship;

- John previously asked Roxie to be added to his accounts to help pay bills and when she declined, John said he would ask Garcia;

- Nguyen's testimony that she always explained right of survivorship was not credible;

- Because Garcia did not understand that a right of survivorship was created during the meeting at BECU, neither could have John;

- John listed his children as the pay-on-death beneficiaries on the form, as well as all previous forms he filled out at BECU;

9

- John would not have expected the box for right of survivorship to be checked based on his prior interactions with BECU;
- John had a propensity to share the details of his estate and would have shared with Garcia and his family if he had granted Garcia a right of survivorship;
- John suffered from cognitive impairment, hearing loss, and poor vision.

1. Meeting at BECU

The computer-generated checkmark on the form that John signed is the most compelling evidence that John intended to add Garcia as a joint account holder with right of survivorship. But no evidence explains why that checkmark appeared on the form. No discussion occurred between John and Garcia about adding her to the account with joint right of survivorship, nor does any of the testimony from anyone present at the meeting recall that Nguyen spoke with John about Garcia receiving a right of survivorship.

Garcia testified she never spoke with John about receiving a right of survivorship and she believed John was adding her to the accounts to pay bills. This testimony is supported by Roxie's testimony that before asking Garcia, John asked her to be added to the accounts to help pay bills. Also, no evidence exists of a discussion between Garcia, John, and Nguyen regarding joint right of survivorship. While Garcia was present for a majority of the meeting, she does not remember what was said or what questions John asked. Garcia confirmed that if Nguyen had "explained that [she] was going to inherit $400,000 plus, so long as [she] was alive when [her] grandfather died," she would remember.

Nguyen testified that while she did not recall the meeting with John, her standard practice is to explain the difference between "with right or survivorship"

10

and "without right of survivorship," but the trial court did not find Nguyen's testimony credible.[4] The court noted "Nguyen's testimony explaining the legal significance between a joint account holder and a joint account holder with right of survivorship was difficult for [it] to understand." The court also did not find Nguyen's testimony credible that she acted in conformity with her standard practice at the meeting with John and Garcia. In making this determination, the court relied, in part, on testimony from Roxie regarding a previous transaction she had at BECU that did not involve Nguyen. Roxie testified that when she added her son to her BECU account, she did not remember the representative discussing right of survivorship, but the box was pre-checked for "Joint Holder with Right of Survivorship." Based on Roxie's testimony, the court found Nguyen "did not act in conformity with her routine practice." The court emphasized that, had a discussion occurred at BECU regarding joint right of survivorship, Garcia would have remembered. Not only that, but if Garcia left that meeting not

---

[4] While we defer to the trier of fact for issues of witness credibility, the manner in which the court addressed Nguyen raises concern. The court questioned the witness on her English proficiency, including whether English was her first language, when she learned English, and how long she studied English. The court then asked Nguyen if a customer had ever told her they were having difficulty understanding her English. The court stated, "when you're the person there talking to [John], it matters how well you communicate in English, because from everything I've heard about [John], he always understood English. You would not have been talking to him in Vietnamese. So your English becomes relevant in this case." The court's extensive questioning regarding Nguyen's English proficiency and education – even after she indicated that she has spoken English since she was 6 years old—and the tone of that questioning, was clearly offensive to Nguyen and was inappropriate. It also raises the concern of whether this was, in part, why the court found Nguyen's testimony was not credible and questioned whether there was a discussion at all about the right of survivorship.

understanding she had a joint right of survivorship, then it was more likely than not that John also did not understand the implications of the form he signed.

### 2. Long-Term Testamentary Intent

The court also found that giving Garcia a joint right of survivorship was not in line with John's long-term testamentary intent. In making this determination, the court relied on the Trust, John's past experiences at BECU, and John's propensity to share the details of his estate plans. First, the court noted that John's children were always named the designated beneficiaries of the Trust, even when it was twice amended. Additionally, John opened several BECU accounts prior to the meeting at issue and each one listed his children as pay-on-death beneficiaries. In regards to these previous transactions, the court noted, "given the evidence that [John] maintained his children as beneficiaries when he signed [the previous forms], [John] would have reasonably expected [the contested] form to have the same effect as the prior forms he signed at BECU."

John also had a propensity to share details of his estate plan with his children and grandchildren. The court found that "[h]ad he understood that he had granted [Garcia] survivorship benefits on his BECU accounts, [John] would assuredly have told [Garcia] and would likely have told his children and [Garcia's] brother."

### 3. Physical Health

The court also relied on evidence regarding John's health to determine that he did not intend to create a joint right of survivorship for Garcia. While conflicting testimony exists as to the degree of John's cognitive impairment at the

time he signed the form, it is undisputed he suffered from hearing loss and poor vision. While the court's findings take some statements out of context,[5] substantial evidence supports a probable finding that John's health contributed to his ability to read and understand the form he signed at BECU.

The evidence is sufficient to support the court's findings by clear and convincing evidence; therefore, it was not error for the trial court to find John lacked intent to give Garcia a right of survivorship.

Deadman's Statute

Garcia contends the trial court erred when it excluded testimony regarding the BECU accounts because the Thompsons waived the Deadman's Statute by offering testimony with respect to the transaction. We agree that by presenting evidence regarding the transaction, the statute was waived; but Garcia suffered no prejudice.

This court reviews evidentiary determinations for abuse of discretion. *City of Seattle v. Pearson*, 192 Wn. App. 802, 817, 369 P.3d 194 (2016). "A trial court abuses its discretion when its decision is manifestly unreasonable or based on

---

[5] In its findings, the court notes that "having cognitive concerns about [John's] ability to drive would also mean that [Dr. Bateson] would have cognitive concerns about him handling his own finances." However, Dr. Bateson specifically declined to discuss John's finances, stating, "I don't think it's professional for a medical provider to discuss finances with patients." She also testified that someone can have cognitive issues that could prevent them from driving but would not prevent them from understanding their finances.

The court also notes that Dr. Mark Koenen testified, "[John] was more likely to make mistakes than a person without impairment." But this statement is taken out of context. What Dr. Koenen said is, "[s]ometimes people can make more mistakes. But for the most part, . . . there's no significant impairment at that point. Not in a state of mild cognitive impairment."

untenable grounds or reasons." *State v. Sullivan*, 18 Wn. App. 2d 225, 234, 491

P.3d 176 (2021).

> RCW 5.60.030, the "Deadman's Statute," provides, in relevant part,

> [I]n an action or proceeding where the adverse party sues or defends as executor, administrator or legal representative of any deceased person, or as deriving right or title by, through or from any deceased person . . . then a party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased . . . person.

> A "party in interest" is any person who "stands to gain or lose in the action

in question." *Bentzen v. Demmons*, 68 Wn. App. 339, 344, 842 P.2d 1015

(1993). For purposes of the statute, a "transaction" includes any matter in which

"the deceased, if living, could contradict the witness of his own knowledge." *Est.*

*of Lennon v. Lennon*, 108 Wn. App. 167, 178, 29 P.3d 1258 (2001).

1. Waiver

The Deadman's Statute can be waived by the adverse/protected party in

three ways: (1) failing to object; (2) engaging in cross examination not within the

scope of direct examination; or (3) offering testimony about the transaction or

communication with the deceased. *Thor v. McDearmid*, 63 Wn. App. 193, 202,

817 P.2d 1380 (1991). Concerning the third type of waiver, testimony by a

protected party about a transaction can include testimony that, even though not

about the specific transaction, goes to the heart of the claims and matters directly

at issue. *Bentzen*, 68 Wn. App. at 345. If the statute is waived by the

adverse/protected party, the door is open for the interested party to offer rebuttal

testimony. *Lennon*, 108 Wn. App. at 175.

14

Here, both Gerald and Roxie testified about the BECU transaction. First, they both testified they did not think their father would have been able to read the font on the BECU form. This testimony addresses matters directly at issue in this case, specifically, whether or not John understood the significance of the form he was signing. Roxie also testified she did not "believe [John] intended [Garcia] to have all of his accounts." The Thompsons do not address Roxie's testimony in their brief, but do argue that Gerald was not a party to the transaction, so the Deadman's Statute does not apply; however, the statute applies to any interested party, which includes Gerald and Roxie. Because both Gerald and Roxie testified about the BECU transaction, the Deadman's Statute was waived and Garcia should have been able to present rebuttal testimony.

2. <u>Prejudice</u>

An evidentiary error is grounds for reversal only if it is prejudicial. *Pearson*, 192 Wn. App at 817. An error is prejudicial if " 'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (quoting *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)).

Here, Garcia was not prejudiced when the court barred her testimony regarding John's intentions for the BECU accounts. The testimony the Thompsons objected to was in response to the question, "Do you believe that your grandfather wanted you to have these accounts." But Garcia was later allowed to respond to a similar question, "Do you have any reason to believe that your grandfather didn't know what he was doing with he signed the BECU

15

document?" While not identical, these questions both address the issue of whether Garcia thought John meant to leave her the contents of the BECU accounts. Because Garcia was able to testify on the same issue when answering another question, she was not prejudiced by the court's ruling.

Furthermore, the court did not rely on any party's testimony concerning their beliefs about what John wanted when making its findings. When the above objection was made, the court noted, "[Garcia's] beliefs aren't determinative of anything." Because the court's decision would not have been influenced even if the testimony was admitted, its absence did not materially affect the outcome of the trial.

Because the Thompsons waived the Deadman's Statute, the court abused its discretion when it did not allow Garcia to testify regarding John's intentions at the BECU meeting. But the error was not prejudicial and, therefore, was harmless.

Prejudgment Interest

Garcia asserts the trial court abused its discretion by requiring her to pay prejudgment interest on the funds she received from the BECU accounts. The Thompsons contend the court was within its discretion because the funds were liquidated and Garcia failed to demonstrate the delay in proceedings was the Thompsons' responsibility. Even though the funds were liquidated, they were legally Garcia's at the time. The court found Garcia did not wrongfully retain the funds; therefore, the court abused its discretion when it required her to pay prejudgment interest.

16

Awards of prejudgment interest are reviewed for abuse of discretion. *Humphrey Indus., Ltd. v. Clay St. Assocs.*, 176 Wn.2d 662, 672, 295 P.3d 231 (2013). A court abuses its discretion when its decision is " 'manifestly unreasonable, exercised on untenable grounds, or exercised for untenable reasons.' " *Humphrey*, 176 Wn.2d at 672 (quoting *Noble v. Safe Harbor Fam. Pres. Tr.*, 167 Wn.2d 11, 17, 216 P.3d 1007 (2009)). Furthermore, "A trial court necessarily abuses its discretion if it misapplies the law." *Matter of Benton Cnty. Water Conservancy Bd. to Perpetuate Testimony*, 26 Wn. App. 2d 738, 742, 530 P.3d 283 (2023).

"A party is entitled to prejudgment interest on liquidated claims to compensate them for loss of use on money that is wrongfully withheld by another party." *TJ Landco, LLC v. Harley C. Douglass, Inc.*, 186 Wn. App. 249, 256, 346 P.3d 777 (2015). It is a "make-whole remedy" grounded in a " 'sense of justice . . . that he who retains money which he ought to pay to another should be charged interest on it.' " *Crest Inc. v. Costco Wholesale Corp.*, 128 Wn. App. 760, 775, 115 P.3d 349, 357 (2005) (internal quotation marks omitted) (quoting *Colonial Imports v. Carlton Nw.*, Inc. 83 Wn. App. 229, 242, 921 P.2d 575 (1996)). Prejudgment interest is triggered when a party "breaches an obligation to pay a liquidated debt" and wrongfully retains the money. *TJ Landco*, 186 Wn. App. at 256.

Here, under the plain language of RCW 30A.22.100, Garcia's obligation to pay the Thompsons the money from the BECU accounts did not arise until the court determined that clear and convincing evidence existed regarding John's

17

intent.  The trial court expressly found that, prior to its judgment, Garcia was not in wrongful possession of the funds:

> At the time of [John's] death, the funds belonging to him that remained on deposit in a joint account with right of survivorship belong to the surviving depositor unless there is clear and convincing evidence of a contrary intent at the time the account was created. . . . [Garcia] was justified in transferring those funds to her own account as the only person then-entitled to the property because there had not yet been clear and convincing evidence submitted for determination in a court of law of a contrary intent at the time the account was created.

Unlike a case where a party is improperly withholding funds,[6] the unchallenged findings here establish no such wrongful withholding.  On this record, the trial court abused its discretion in awarding prejudgment interest.  We remand with instructions to strike the prejudgment interest.

## Attorney Fees

Garcia claims the trial court erred by awarding the Thompsons attorney fees and costs because they did not bring suit against the proper party and did not prove by clear and convincing evidence that John did not intend to give her a right of survivorship on the BECU accounts.  Additionally, both parties request attorney fees on appeal.  Because the trial court did not err when awarding attorney fees, we affirm the judgment.  We decline to award fees to either party on appeal.

---

[6] For example, in *Crest Inc. v. Costco Wholesale Corporation*, 128 Wash. App. 760, 115 P.3d 349 (2005), the court had to interpret the terms of a contract in order to determine which party had a rightful claim to the funds.

1. Trial Court Attorney Fees

Under RCW 11.96A.150,

> [e]ither the superior court or any court on appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party. . . . The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable. In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.

Here, the trial court awarded Garcia attorney fees and costs she incurred in defending against the claims on which she prevailed. Likewise, the court awarded the Thompsons costs and reasonable attorney fees incurred in successfully prosecuting their RCW 30A.22.100 and constructive trust claims. Awarding these costs and fees is equitable under RCW 11.96A.150; therefore, the court did not abuse its discretion.

2. Attorney Fees on Appeal

RAP 18.1 provides that applicable law may grant a party the right to recover reasonable attorney fees or expenses on review. A party requesting fees under RAP 18.1 must provide argument and citation to authority "to advise the court of the appropriate grounds for an award of attorney fees as costs." *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012).

Here, both Garcia and the Thompsons requested an award of fees under RAP 18.1. Garcia cites to RCW 11.96A.150, but fails to provide an argument in support of her requests. Because Garcia failed to comply with the mandatory requirements of RAP 18.1(b), we deny her request for attorney fees.

19

The Thompsons also cite to RCW 11.96A.150 in their request for attorney fees on appeal. The Thompsons contend that if this Court affirms the trial court's judgment, we should grant fees for the same reasons the trial court awarded fees. As noted above, under RCW 11.96A.150, an appellate court has discretion to award fees and may consider any factors it deems relevant. Here, both Garcia and the Thompsons have brought legitimate claims and presented evidence supporting their claims. Because both parties raised legitimate legal arguments in a case that is a very close call, we do not find it appropriate to award attorney fees to either party and, therefore, we also deny the Thompsons' request for attorney fees on appeal. We deny both parties their requests for attorney fees on appeal.

We affirm the trial court in part but remand with instructions to strike the prejudgment interest.

_Smith, C.J._

I CONCUR:

_Chung, J._

*In the Matter of the John E. Thompson and Darleene P. Thompson Living Trust*,
No. 85574-3-I

FELDMAN, J. (concurring in part, dissenting in part) – I agree with the reasoning and holding of the court's opinion with one narrow exception:  I respectfully dissent from the majority's holding that the trial court abused its discretion in awarding prejudgment interest.

Our Supreme Court has repeatedly held, "Where the claimed amount is liquidated, the rightful claimant of the funds should be compensated for the lost 'use value' of the money."  *Forbes v. Am. Bldg. Maint. Co. W.*, 170 Wn.2d 157, 167, 240 P.3d 790 (2010) (quoting *Hansen v. Rothaus*, 107 Wn.2d 468, 473, 730 P.2d 662 (1986)).  "A claim is liquidated when the amount of prejudgment interest can be computed with exactness from the evidence, without reliance on opinion or discretion."  *Id.* at 166.  There is no dispute here, nor could there be, that the claimed amount is liquidated:  Garcia froze, then transferred to her personal account, funds totaling $415,000.

The record also establishes that this deprivation was improper.  Under RCW 30A.22.100(3), "Funds belonging to a deceased depositor which remain on deposit in a joint account with right of survivorship belong to the surviving depositors unless there is clear and convincing evidence of a contrary intent at the time the account was created."  Applying this provision, the trial court concluded the Thompsons "prevailed on their claim pursuant to RCW 30A.22.100.  They established by clear and convincing evidence that John Thompson did not intend to grant Jennifer Garcia rights of survivorship when he

executed the BECU form on December 30, 2019." This court, in turn, has now affirmed that determination. Thus, the funds at issue did not belong to Garcia when she transferred them to her own account.

The trial court's ruling regarding the Thompsons' conversion claim does not alter the above conclusion. Although the trial court found that "Garcia was justified in transferring those funds to her own account," our Supreme Court explained in *Forbes* that "prejudgment interest may be awarded not only when one party has improperly used the funds, but also when one party is improperly deprived of those funds." 170 Wn.2d at 168. This latter situation occurred here when Garcia froze the funds in the BECU accounts and transferred them into her own account despite "clear and convincing evidence of a contrary intent at the time the account was created." RCW 30A.22.100(3).

On this record, I would hold the trial court did not abuse its discretion (nor did it err) in concluding the Thompsons were improperly deprived of the use of the disputed funds and that they were therefore entitled to an award of prejudgment interest. On that narrow point, I dissent.

Feldman, J.

2